COOK *v.* STATE.

4099                                                              121 S. W. 2d 87

Opinion delivered November 7, 1938.

*J. W. Johnston* and *Strait & Strait*, for appellant.

*Jack Holt*, Attorney General, *Jno. P. Streepey*, Assistant Attorney General, for appellee.

HUMPHREYS, J.   Appellant was indicted for murder in the first degree in the circuit court of Conway county for shooting his father and killing him on May 5, 1936, and upon a trial of the charge was convicted of voluntary

manslaughter and sentenced to serve a term of two years in the state penitentiary as punishment therefor.

Appellant has duly prosecuted an appeal to this court from the judgment and seeks reversal thereof because he alleges the evidence is insufficient to sustain the conviction and because the court refused to give instructions Nos. 1 and 2 asked by him.

The rule governing as to whether the evidence is sufficient to sustain the verdict is that the verdict must be supported by some substantial evidence. If the verdict is sustained by any substantial evidence, when viewed in the light most favorable to the state this court, on appeal, cannot disturb the verdict and judgment.

The record reflects that about the first of February, 1935, appellant's father and mother separated. The father, H. W. Cook, commonly known as Wiley Cook, owned a farm with several houses upon it. One of the houses was occupied by appellant and the other by his father, Wiley Cook. Appellant's mother and two of their younger sons moved over to the house occupied by appellant and took practically everything out of the house or home place occupied by Wiley Cook. Appellant claimed to have rented a part of the farm upon which he was residing from his father and his father denied that he had rented it to him. The houses were about a half a mile apart. In January or February after their separation, Wiley Cook prevailed upon another son, Dick Cook, to come and live with him. Dick and appellant had a little fuss over the land. Wiley Cook had been trying to get appellant off the place because he had not paid any rent. Appellant stated to Dick Cook that he wasn't going to take orders off of his father and wasn't going to move. Before Dick Cook moved out to take care of his father he had a conversation with appellant in which appellant told him that he wanted him to come over and get the old gray headed son-of-a-bitch as he and his mother were going to take everything out of the house where his father was living. Dick replied to him that his father was able to take care of himself. Dick claimed he had the land rented where appellant was living. Appellant told Dick

that he was going to work the land and didn't intend to move.

Appellant had a conversation with A. A. Scroggins, a nephew of Wiley Cook, about a month before the killing concerning the trouble between Wiley Cook and his wife. Appellant told Scroggins that if Wiley Cook didn't quit coming down there and bothering him he was going to use unfair means. Later appellant had another conversation with Scroggins and appellant told him that if Wiley Cook didn't quit bothering him he was going to shoot him.

On the morning of May 5, 1936, appellant put Monroe Dempsey to plowing in a field on the land he claimed to have rented from his father and which his father denied renting to him. Wiley Cook came into the field and asked Dempsey who gave him orders to plow and when he answered that appellant had he told him to quit. Dempsey tied the lines up and went back to appellants house, told him what occurred and got appellant's gun. Appellant took the gun out of his hand and when Dempsey refused to go back and plow without protection appellant went back with him taking the gun himself. When he reached the field he laid the gun down by a cherry tree and told Dempsey to go to plowing. Later in the morning his father returned and told appellant to get that "club footed son-of-a-bitch off of his land." Dempsey then unhooked one of the single trees and started after his father when appellant stopped him and told him to go back to plowing, which he did. Later on appellant called to Dempsey, "yonder comes daddy, get behind the horses," and appellant got behind the cherry tree. As his father approached Dempsey called to him and said, "Uncle Wiley, lets settle this without trouble, some other way," and Uncle Wiley said, "Hell."

At this juncture Dempsey testified as follows: "Q. About that time they started firing? A. The guns began firing. Q. Who fired first? A. Mr. Cook. Q. Who fired the next shot? A. Carl Cook, over my head, out over my head. Q. Mr. Cook fired, then Carl Cook fired, then they fired back and forth—How far apart—snap your fingers? A. I don't have much idea how fast they

did fire, because I was frightened myself. I was interested in holding the horses. Q. It didn't seem to you that it took very much time in all, the shots that were fired? A. It wasn't as long as it seemed. Q. You say that while that was going on that Lewis came out from behind that clump of bushes, came on his father while he was shooting at Carl? A. Yes, sir. Q. And struck and hit him with his gun? A. Yes, sir."

During the exchange of shots or about the time the firing ceased between appellant and his father Lewis and James, brothers of appellant, came out of the brush and started toward their father. James had a gun. Wiley Cook fired at Lewis twice, but the boys ran on toward their father and Lewis struck him over the head with his gun, knocking the rifle out of their father's hands and they together with appellant who had run out to them overpowered their father and took a pistol out of his scabbard. During the firing appellant had shot his father in the breast, abdomen and legs and his father had shot him in the leg near the hip. They then put their father in the wagon and took him to appellant's house where he was administered to by physicians who had been sent for. Wiley Cook was in a semi-conscious condition, but asked the boys while being taken away not to kill him. Wiley Cook was taken from appellant's house to the hospital where he died the next day from the gun shot fired by appellant. When they were firing, appellant and his father were about ninety yards from each other.

The court instructed the jury on all degrees embraced in the murder charge.

He told the jury that manslaughter is the unlawful killing of a human being without malice, express or implied and without deliberation.

Then he defined voluntary and involuntary manslaughter as follows:

"Manslaughter must be voluntary upon a sudden heat of passion, caused by provocation and apparently sufficiently to make the passion irresistible. That is voluntary manslaughter."

"If the killing be in the commission of an unlawful act, without malice and without the means calculated to

produce death, or in the prosecution of a lawful act, done without due caution and circumspection, it shall be manslaughter. That is involuntary manslaughter.''

The court did not mention in his charge the punishment for involuntary manslaughter, but there was no error in this as there is no evidence in the record tending to support a verdict for involuntary manslaughter.

Appellant argues that there is no evidence in the record tending to show appellant was guilty of voluntary manslaughter. We think the verdict for voluntary manslaughter is supported by the evidence. It is argued that the evidence shows that appellant only did what was necessary to defend himself from the assault made upon him by his father. The record reflects that when Dempsey came to the house and informed appellant that his father had ordered him out of the field and that he would not go back to plowing without protection, appellant took his gun and went to the field, laid it down by the cherry tree and told Dempsey to go back to work. It is clearly inferable, and the jury might have so found, that he went to the field for the purpose of protecting Dempsey even though it required some shooting at his father to do so. The jury might also have reasonably found from the evidence that appellant could have avoided the shooting by leaving the field or by not taking his gun to the field. The dispute over the land was a matter which could have been settled in the courts without the necessity of shooting it out in the field.

The court gave instructions relative to the law of self-defense which are not challenged, but appellant asked two instructions which were refused by the court that told the jury in effect that appellant had the right, as a matter of law, to defend himself from a dangerous assault made upon him, if any, by his father to the same extent that he would have had against a person of no relation to him. Appellant argues that it was error not to give these instructions. We cannot agree for the reason that the instructions on self defense embraced all persons including, of course, the father. It was not necessary in giving correct instructions on the law of self defense to tell them

that he had a right to defend against his father when his father was included in the general instruction.

No error appearing, the judgment is affirmed.

SMITH, J., dissents.

SMITH, J. (dissenting). It may be thought by some —and the view may have been entertained by members of the jury—that no one should kill his father under any circumstances, not even in his necessary self-defense, but that he should waive his right to defend himself and be killed rather than to kill his father, when put to the unfortunate necessity of making the choice of being killed or of killing his father. This, however, is not the law, as the majority opinion reflects.

Appellant requested the court to give an instruction numbered 1, to the effect that ". . . the defendant, Carl Cook, had the right, as a matter of law, to defend himself from a dangerous assault made upon him, if any, by his father, to the same extent that he would have had against a person of no relation to him."

The majority defend the action of the court in refusing to give this instruction, not upon the ground that it is not the law, but upon the ground that it was covered by other instructions on the law of self-defense. It is true the court gave instructions, which are correct, upon the law of self-defense; but these are what might be called the "usual instructions" in such cases, instructions which, as the majority say are applicable to all cases. But those instructions took no account of the relationship of the parties, whereas instruction numbered 1, requested by appellant, did take that relationship into account, and as none of the instructions given dealt with the effect of this relationship, it was, in my opinion, error to refuse to declare the law specifically upon this subject.

Here the undisputed evidence is to the effect that deceased and his wife, the mother of appellant, had separated, and appellant had given his mother shelter on a portion of deceased's farm which appellant had rented. There appears to be no question but that deceased had determined to drive appellant from the farm, and, as a means to that end, went to the land, where appellant and

his hired man were working, armed with a Winchester rifle and a revolver. Appellant sought refuge behind a small tree, which, unfortunately, was not large enough to afford complete protection. Deceased was known to be an expert rifle shot, and commenced shooting his rifle at appellant, whose body was not entirely protected. The testimony is undisputed to the effect that it was only after appellant had been shot in the hip, the portion of his body exposed to fire, that he picked up his gun, loaded with squirrel shot, and fired what proved to be a fatal shot.

Under these circumstances, I think it was error to refuse the specific charge that appellant was not deprived of his right of self-defense by the fact that his assailant was his father. The revulsion which every one must feel where a man kills his father, fully shared by me, is such that I hesitate to dissent in this case; but it is the very consciousness of this revulsion which constrains me to dissent, if we are to try cases according to law and not according to sentiment and prejudice. If it be the law—and the majority make that concession—that a man is not deprived of the right of self-defense because his assailant is his father, appellant was entitled to have the jury so instructed.

I, therefore, respectfully dissent from the holding that there was no error in refusing to give instruction numbered 1.